UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
U2 HOME ENTERTAINMENT, INC.,            :

                        Plaintiff,      :

                                        :
                                        :
            – against –                 :    04 Civ. 6189(JFK)
                                        :    **OPINION & ORDER**

HONG WEI INTERNATIONAL TRADING, INC.    :
and JIXONG NI d/b/a HONG WEI, INC.      :
                        Defendants.     :
----------------------------------------X
<u>APPEARANCES</u>:


        <u>For Plaintiff:</u>
                SARGOY, STEIN, ROSEN & SHAPIRO
                1790 Broadway, 14th Floor
                New York, New York 10019
                    Of Counsel: Harvey Shapiro, Esq.



        <u>For Defendants:</u>
                LAW OFFICES OF BING LI, ESQ.
                1350 Broadway, Suite 1001
                New York, New York 10018-0947
                    Of Counsel: Bing Li, Esq.



**JOHN F. KEENAN, United States District Judge.**

**JOHN F. KEENAN, United States District Judge:**

Plaintiff U2 Home Entertainment Corp. ("U2 Home" or "Plaintiff"), the exclusive United States distributor of certain Chinese-language television programs produced in Asia, has brought this action for copyright and trademark infringement against Defendants Hong Wei International Trading, Inc. ("Hong Wei") and Jixong Ni ("Ni", and collectively, the "Defendants"), the operators of a Manhattan retail video store, for renting out unlawfully duplicated copies of U2 Home's programs. U2 Home now moves for summary judgment on its copyright claim and dismissal of Defendants' counterclaim for deceptive business practices. For the reasons that follow, U2 Home's motion is granted.

**BACKGROUND**

*The Parties*

Plaintiff U2 Home is a California company, doing business under the names Century Home Entertainment, New Image Audio and Video, and Tai Seng Entertainment (formerly known as Tai Seng Marketing). U2 Home is in the business of licensing and distributing Chinese-language films and television programs on videotape, digital versatile discs ("DVDs"), and video compact discs ("VCDs"). U2 Home has exclusive authority in the United States to import, reproduce and distribute a series of Chinese soap operas that are produced in Hong Kong and that encompass numerous titles (the "TVB Series").

Defendant Hong Wei was a New York corporation, and Defendant Ni was its sole principal. Defendants operated a video store at 32 East Broadway, in Manhattan, that sold and rented Chinese-language films and television programs to its retail customers. On December 8, 2005, the Hong Wei store ceased activity, and the business was transferred to HWV Corp., a company that is not a party to this action.

*The Prior Action*

This is the second time that U2 Home has sued Defendants for unlawful duplication of U2 Home's videoprograms. On July 24, 2002, Plaintiff brought a lawsuit against Defendants in this Court, asserting claims of trademark and copyright infringement on the ground that Defendants were unlawfully duplicating and distributing copies of the TVB Series. See U2 Home Entertainment, Inc. v. Hong Wei International Trading, Inc. et al., No. 02 Civ. 5828 (JFK) (S.D.N.Y.) (the "Prior Action"). Evidence of Defendants' unauthorized copying included 1,769 illegally copied VCDs, representing twenty-three separately copyrighted titles of the TVB Series, that United States Marshals seized from the Hong Wei store. The case proceeded to a bench trial. In the pre-trial order, Defendants stipulated that U2 Home held exclusive rights to a number of separately registered works in the TVB Series. During the bench trial, Defendants admitted that they had copied DVDs of the TVB Series onto their own VCDs.

After the trial had concluded, but before the Court decided the case, the parties reached a "Settlement Agreement." The Settlement Agreement provided that Defendants would pay $100,000 to Plaintiff; consent to the entry of a Court-ordered permanent injunction prohibiting Defendants from further acts of unlawful copying and distribution of U2 Home's programs; and enter into a non-exclusive sublicensing agreement.

On November 21, 2003, the parties executed a "Sublicensing Agreement," pursuant to which Defendants were granted a non-exclusive license to purchase copies of the TVB Series programs from U2 Home and rent those programs to their retail customers. (Aff. of Harvey Shapiro in Support of Mot. for Summary Judgment ("Shapiro Aff."), Ex. C. at 0214.) Under the section entitled "Rights and Obligations of Sublicensee," Defendants represented that

> (a) Sublicensee has no rights to and shall not copy or permit or permit to be copied any of the TVB Programs licensed hereunder or any part thereof.
>
> (b) Sublicensee shall not sell any TVB Videograms supplied.

(Id. Ex. C.at 0215.) The Sublicensing Agreement included a schedule that set forth, among other things, the fees that Defendants were required to pay to U2 Home, as well as the minimum purchases of TVB Series programs that Defendants were required to make ("Schedule A"). Specifically, Schedule A provided that, from December 1, 2003 to November 30, 2004, Defendants would pay

4

Plaintiff a fee of $100,000, and receive in return a total of 14,800 sets of DVDs of the TVB Series programs. (<u>Id.</u> Ex C. at 0212.) Defendants had the right to purchase additional DVDs of the TVB Series for $6.76 each. Schedule A also contained a paragraph entitled "VCD Minimum Order," which stated that Defendants "shall purchase a minimum of <u>**0**</u> set(s) of each VCD released during the Term." (<u>Id.</u> Ex C. at 0213, ¶ 7.)

On December 31, 2003, the Court-ordered permanent injunction was filed, pursuant to the parties' consent (the "Permanent Injunction"). Under the Permanent Injunction, Defendants were "permanently enjoined and restrained" from:

> (a) Infringing Plaintiff's exclusive rights under copyright in the motion pictures duly copyrighted by Plaintiff or in which Plaintiff owns exclusive distribution rights;
> (b) Importing, manufacturing, copying, duplicating, or knowingly selling, renting, distributing performing or otherwise disposing of any unauthorized videocassette or videodisc copies of the [TVB Series] . . . .

(<u>Id.</u> Ex. B.)

After the execution of the Sublicensing Agreement and the entry of the Permanent Injunction, Defendants continued to distribute unlawfully duplicated VCD copies of U2 Home's TVB Series DVDs. U2 Home learned of the continuing infringement and, on April 13, 2004, sent Defendants a cease-and-desist letter, that was addressed to Jixong Ni and that Ni subsequently admitted to having received and understood. Defendants did not respond to the letter. U2 Home subsequently sent undercover agents to the Hong Wei store,

where the agents purchased a total of 91 VCDs containing unlawfully copied episodes of eight separately copyrighted TVB Series titles.[1]

*The Contempt Proceedings*

On September 28, 2004, U2 Home moved by order to show cause to hold Defendants in contempt for their violation of the Permanent Injunction. The Court held a contempt hearing over several days in December 2004 and January 2005, during which Jixong Ni and Alan Huie ("Huie"), U2 Home's general counsel, among others, testified. On May 3, 2005, the Court issued its Findings of Fact and Conclusions of Law. See U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc., No. 02 Civ. 5828 (JFK), 2005 U.S. Dist. LEXIS 14790 (S.D.N.Y. May 3, 2005) (the "Contempt Order").

In the Contempt Order, the Court found that the terms of the Permanent Injunction were clear and unambiguous and that Jixong Ni, as the Defendants' principal, was aware of his obligations under the settlement agreement, including the Permanent Injunction. The Court further found that, on the basis of copyright registrations submitted by Plaintiff for the eight TVB Series titles that encompassed the 91 VCDs that were purchased from the Hong Wei store, as well as the parties' stipulation in the pre-trial order, Plaintiff was the exclusive owner of copyright in the

_____

[1] The eight titles were: Dream of Colors, Golden Faith, The Duke of Mount Deer, A Handful of Love, Hidden Treasures, To Get Unstuck in Time, Triumph in the Skies, and Twin of Brothers.

"Subject TVB Programs." Id. at *6.  In addition, the Court found

that no authorized VCD versions of any of the TVB Series titles

governed by the Sublicensing Agreement had ever been supplied to

the Defendants.  The 91 VCDs at issue were on plain, silver discs

and contained handwritten inventory numbers.  As Huie testified, U2

Home had never provided these VCDs, or VCD versions of any TVB

Series programs, to the Defendants.  The Court credited Huie's

testimony, stating that "Plaintiff did not provide Hong Wei any VCD

copies of the TVB Programs provided under the TVB Sublicense.  As

U2's general counsel Alan Huie testified, there are no authorized

VCD copies of recent TVB Programs." Id. at *8.  Thus, the Court

concluded that the VCDs that Plaintiff's undercover agents

purchased had been unlawfully copied from the DVDs that Plaintiff

had supplied to Defendants under the Sublicensing Agreement.

Further, the Court held that the act of selling the VCDs also

violated the Sublicensing Agreement because, under the agreement,

Defendants were permitted only to rent, and not to sell, the TVB

Series programs to their customers.  As the Court stated, "Mr. Ni

could not rent or sell these VCDs without infringing Plaintiff's

copyright and violating the injunction." Id. at *12 (emphasis in

original).  In sum, the Court determined that U2 Home had

established not only clear and convincing evidence of Defendants'

noncompliance with the Permanent Injunction, but "noncompliance

beyond any doubt." Id. at *18.  Accordingly, the Court held

Defendants in contempt of the Permanent Injunction and ultimately imposed sanctions of $52,929.92. Defendants filed an appeal from the contempt judgment, but the appeal was dismissed as untimely. See Prior Action, Mandate of Second Circuit, Mar. 6, 2007 (Doc. No. 43).

*The Present Action*

On August 10, 2004, Plaintiff filed the present lawsuit, asserting claims for copyright infringement under the Copyright Act, 17 U.S.C. §§ 501 et seq., and trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a). U2 Home sought the issuance of another permanent injunction, impoundment of infringing materials, and an award of statutory damages for each instance of infringement, as well as costs and attorneys' fees. In an amended answer to the complaint, Defendants asserted a counterclaim in which they alleged that U2 Home was culpable of deceptive business practices under Section 349 of New York's General Business Law, for misleading Defendants into believing that Tai Seng was a division of U2 Home when, in fact, Tai Seng was merely one of several "doing business as" names used by U2 Home.

Following the resolution of the contempt proceedings in the Prior Action, fact discovery proceeded in this case.[2] During discovery, Defendants produced several hundred rental cards that

_____

[2] Fact discovery concluded on May 25, 2007. There has been no expert discovery.

were routinely used in the course of Hong Wei's business. The
rental cards, and the manner in which Hong Wei maintained its
rental records, were discussed by Ni during his testimony at the
contempt hearing. A rental card was filled out by Defendants each
time a customer rented a TVB Series title from the Hong Wei store.
The rental card contained the date of the rental, the title and
inventory number of the TVB Series title, the customer's store
membership number, and the number of episodes contained on the disc
rented by the customer. If the rental was for a TVB Series work
that was on DVD, the letters "DVD" were listed on the rental card.
If the rental listing did not include the "DVD" notation, the
rental was of a VCD.[3]

U2 Home analyzed cards that listed rentals of TVB Series
programs from December 31, 2003 (the date of the filing of the
Permanent Injunction) to December 8, 2005 (the date on which the
Hong Wei store ceased operation) (the "Relevant Period").
Plaintiff tallied the number of separately copyrighted TVB Series
works that were rented out in VCD format to Hong Wei's customers
during the Relevant Period.[4] U2 Home has submitted a schedule of

_____

[3] For example, a sample rental card reveals that on January
1, 2004, Member Number 3087 rented episodes 1-20 of the TVB
Series title "Armed Reaction IV." Because the letters "DVD" were
not included on the rental card, the rental was made on VCD.

[4] Many of the separately registered programs have the same
title but contain different ranges of episodes. For example, "To
Catch the Uncatchable, Episodes 1-20,"is registered separately,
and thus considered a separate title from "To Catch the

TVB Series titles that were rented out by the Hong Wei store during the Relevant Period (the "Amended Schedule"). (See Supplemental Aff. of Harvey Shapiro in Further Support of Pl. Mot. for Summary Judgment ("Shapiro Supp. Aff."), Ex. G ). The Amended Schedule lists 70 separately copyrighted titles of the TVB Series, comprising a total of 1,236 separate episodes.[5] Plaintiff has produced copyright registrations for each of the 70 titles at issue, as well as documents demonstrating the valid chain of title for those works. (See Huie Aff., Exs. A-C.) Plaintiff's valid exclusive ownership of copyright for each of the 70 TVB Series works is uncontested.

U2 Home contends that the undisputed evidence establishes that each rental of a VCD version of a TVB Series work during the Relevant Period constituted a violation of U2 Home's copyright. U2

---

Uncatchable, Episodes 21-25."

[5] Plaintiff initially claimed that, during the Relevant Period, Defendants had rented out VCDs encompassing 93 separate, validly registered TVB Series titles and 1,381 episodes. (See Huie Aff., Ex. E.) However, in opposing the present motion, Defendants alleged infirmities with respect to the chain of title or factual errors in Plaintiff's analysis of the rental cards with respect to twenty-three of the TVB Series titles. In its reply brief, Plaintiff continues to assert that it owns a valid copyright in all 93 titles and that Defendants' conduct constituted infringement of all of those titles; however, in order to "ensure that there are no material factual issues in dispute," (Pl. Reply Mem. at 12), Plaintiff amended its schedule of alleged infringement to include only the 70 titles (comprising 1,236 separate episodes) in which it is undisputed that Plaintiff owns copyright and for which it is undisputed that Plaintiff's analysis of the rental records was correct.

Home has submitted the affidavit of Huie, who states here, as he stated at the contempt hearing, that "U2 Home does not distribute copies of the new TVB Series releases in VCD format but only in digital versatile disc ('DVD') format," and that "no store has ever been authorized to duplicate copies of the TVB Series." (Alan T. Huie Aff. in Support of Plaintiff's Mot. for Summary Judgment ("Huie Aff.") ¶ 21.) Thus, the "VCDs distributed by Hong Wei are illegally duplicated and in violation of U2 home's rights under copyright." (Id.)

Defendants do not affirmatively claim or offer any evidence to show that the 70 TVB Series titles listed in the Amended Schedule were ever supplied to them in authorized VCD format. Rather, Defendants have submitted evidence, consisting of shipping invoices, dated July 29, 1998 to July 5, 2002, to show that, prior to the execution of the 2003 Sublicensing Agreement, they received certain titles of Plaintiff's videoprograms in authorized VCD format. (See Decl. of Jixong Ni in Opp. To Pl. Mot. for Summary Judgment ("Ni Decl."), Ex. G.) In addition, Defendants have submitted a letter, dated December 6, 2005, written by U2 Home's sales manager, Cindy Ng ("Ng") to HWV Corp., shortly before the transfer or sale of the Hong Wei store, in which Ng states that "[a]ccording to our records, 29,293 TVB program DVD and VCD discs were supplied to Hong Wei Company." (Ni Decl., Ex. C, at 00084.) Defendants also offer the affidavit of Ni, who states that,

beginning in 1998, an oral agreement arose between Defendants and U2 Home. Under this agreement, Ni states that in return for the payment of a monthly fee of $2,000, Defendants were authorized by U2 Home to sell and/or rent U2 Home's programs in both DVD and VCD format. Ni asserts that this arrangement continued until December 2005, when the Hong Wei store was transferred to HWV Corp. Ni also asserts that "[b]etween 1998 and 2002, Cindy [Ng] had always assured me that, as long as Hong Wei made a monthly purchase of its video programs, her company would not take any legal action against Hong Wei for renting out these video programs." (Ni Decl. ¶ 16.) Defendants also point to a provision of the Sublicensing Agreement that purportedly raises an issue of fact about whether Defendants were actually authorized to distribute VCD versions of the TVB Series programs and a release-and-waiver clause in the Settlement Agreement that purportedly bars U2 Home from now asserting a claim of copyright infringement with respect to a number of the titles listed on the Amended Schedule.

U2 Home seeks summary judgment in favor of its copyright claim and an award of statutory damages of $750 per incident of infringement.[6] U2 Home contends that each of the 1,236 episodes on the unlawfully duplicated VCDs that were rented to Hong Wei's

---

[6] U2 Home is not seeking to recover damages on its Lanham Act claim. At oral argument, Plaintiff's counsel represented that U2 Home would relinquish its Lanham Act claim in the event that it prevailed on the copyright claim.

customers during the relevant period constituted an incident of infringement. Accordingly, U2 Home seeks damages in the amount of $927,000. In addition, U2 Home requests reasonable attorneys' fees and costs, as permitted under the Copyright Act. Finally, Plaintiff seeks summary judgment dismissing Defendant's deceptive practices counterclaim under New York General Business Law § 349, on the ground that Defendants have produced no evidence and thus raised no issue of triable fact as to whether Plaintiff's use of the "Tai Seng" name was a deceptive practice within the meaning of Section 349.

**ANALYSIS**

*Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Where the moving party meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In determining whether there is a genuine issue as to any material

13

fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. To defeat a summary judgment motion, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); see also Contemporary Mission v. United States Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981)(stating that an "opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions")(internal citations and quotation marks omitted). Where it is clear that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" summary judgment should be granted. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).

*(A) COPYRIGHT INFRINGEMENT*

A copyright infringement claim has two elements: (1) "ownership of a valid copyright" and (2) "the copying of constituent elements of the work that are original." Fonar Corp. v. Domenick, 105 F.3d 99, 103 (2d Cir. 1997). Although an exclusive licensee is not a copyright owner, "exclusive licensees are treated

as copyright owners for the purpose of protection and remedy pursuant to § 201(d)(2)," <u>Morris v. Business Concepts, Inc.</u>, 259 F.3d 65, 70 (2d Cir. 2001), and thus may sue for copyright infringement. <u>Random House, Inc. v. Rosetta Books LLC</u>, 283 F.3d 490, 491 (2d Cir. 2002). There is no dispute that U2 Home is the exclusive holder of a license to distribute the TVB Series programs in the United States and has the right to bring this action for copyright infringement.

*(I) U2 Home's Ownership of Copyrights in the TVB Series Titles*

Defendants do not dispute in their brief, and conceded at oral argument, that U2 Home is the exclusive owner of copyrights in the 70 TVB Series titles listed in the Amended Schedule. Defendants have submitted copyright registration certificates for each of these 70 titles. (Huie Aff., Ex. F.) "A certificate of copyright registration is prima facie evidence that the copyright is valid." <u>Fonar</u>, 105 F.3d at 104. In addition, Plaintiff has provided chain-of-title documents to show that it is the owner of exclusive licensing rights in the TVB Series works, (<u>see</u> Huie Aff., Exs. A-C), as well as Huie's own attestation, as U2 Home's general counsel, that U2 Home has valid title to the 70 TVB Series works at issue. (<u>Id.</u> ¶¶ 4-11.) Accordingly, U2 Home has established as a matter of law that it holds a valid copyright in the 70 TVB Series titles listed in U2 home's amended schedule of infringed works.

*(II) Defendants' Infringement of the TVB Series Titles*

Under Section 106 of the Copyright Act, U2 Home has the exclusive right to make copies and distribute recordings of the TVB Series works. See 17 U.S.C. §§ 106 (1), (3). Defendants do not, and cannot, dispute that, to the extent it is determined that they duplicated the TVB Series DVDs onto VCDs without authorization from U2 Home and/or rented those unlawfully duplicated VCDs to their retail customers, they are culpable of copyright infringement. It is further undisputed that Defendants rented out the 70 TVB Series works in VCD format during the relevant time period. As Ni admitted at the contempt hearing, and as Defendants have conceded on this motion, the rental records disclosed by Defendants conclusively establish whether a particular disc was rented out in DVD or VCD format, and Defendants have not challenged the accuracy of U2 Home's analysis of the rental records with respect to the 70 TVB Series titles. Defendants further concede that, following the execution of the Sublicensing Agreement, they were provided only with DVDs of the TVB Series works. Finally, it is undisputed that the 2003 Sublicensing Agreement expressly prohibited any duplication of the TVB Series DVDs, stating that the Defendants "ha[ve] no rights to and shall not copy or permit to be copied, any of the TVB Programs licensed hereunder or any part thereof." (Shapiro Aff., Ex. C at 0215.)

As noted, U2 Home has offered evidence, in the form of Huie's affidavit, to establish that Defendants were never given

authorized VCDs of the TVB Series works.  Further, this Court held in the Contempt Order that "Plaintiff did not provide Hong Wei any VCD copies of the TVB Programs provided under the TVB Sublicense. As U2's general counsel Alan Huie testified, there are no authorized VCD copies of recent TVB Programs." Contempt Order, at *8.  In their opposition, Defendants have not affirmatively alleged, or offered any evidence to show, that they were ever given authorized VCD versions of any of the 70 TVB Series titles that are identified on U2 Home's Amended Schedule of infringed works.  Thus, U2 Home has established beyond any genuine issue of material fact that Defendants rented out unlawfully duplicated VCD versions of the 70 TVB Series works at issue, in violation of U2 home's exclusive copyright in those works.

Defendants assert several reasons why an issue of triable fact exists as to whether their distribution of VCD versions of the TVB Series works was authorized.  Defendants' arguments can be summarized as follows.  First, Defendants claim that the evidence shows that U2 Home distributed authorized VCDs to the Defendants prior to the execution of the Sublicensing Agreement, and therefore an issue of fact exists about whether any of the 70 TVB Series titles that were distributed to Defendants prior to the execution of the Sublicensing Agreement were actually in VCD form.  If certain TVB Series titles were provided to Defendants in authorized VCD format prior to the Sublicensing Agreement, the argument

proceeds, then those VCDs were never unlawfully duplicated, and it was not a violation of U2 Home's copyright for the Defendants to continue to rent out those authorized VCDs after the execution of the Sublicensing Agreement. Second, Defendants argue that paragraph seven of Schedule A of the Sublicensing Agreement, which expressly addresses the distribution of TVB Series VCDs, indicates that the distribution of the 70 TVB Series Titles in VCD format was actually authorized. Third, Defendants argue that a release-and-waiver provision of the Settlement Agreement now precludes U2 Home from binging any copyright claim with respect to any of the TVB Series titles that were the subject of the Prior Action. Finally, Defendants argue that an "implied license" arose between them and U2 Home, pursuant to which Defendants were allowed to copy U2 Home's DVDs onto VCDs. None of these arguments have merit.

*(i) Distribution of Authorized VCDs Prior to Sublicensing Agreement*

Defendants present evidence in an attempt to show that, prior to the Sublicensing Agreement, U2 Home supplied them with authorized VCD versions of videoprograms, including certain TVB Series works. Specifically, Defendants have submitted (i) a sampling of shipping invoices, from 1998 to 2002, that show that U2 Home provided Defendants with VCD versions of a number of different titles; (ii) the letter from Cindy Ng to HWV Corp., in which Ng stated that "29,293 TVB program DVD and VCD discs" were distributed to the Hong Wei store; and (iii) the declaration of Ni, who states

that U2 Home routinely provided Hong Wei with VCDs beginning in 1998, pursuant to an oral agreement that arose between the parties. Defendants claim that this evidence raises a genuine issue of fact as to whether, prior to the 2003 Sublicensing Agreement, Defendants received authorized VCD versions of certain of the 70 TVB Series works. Defendants point to rental records that show that many of the 70 TVB Series titles at issue were rented out to customers in VCD format prior to the Sublicensing Agreement; thus, the argument goes, the VCD versions of these titles that Defendants rented to their customers after the execution of the 2003 Sublicensing Agreement may not have been unlawfully duplicated, but rather were authorized VCD versions that U2 Home had provided previously. Defendants argue that, because an issue of fact exists as to whether these TVB Series titles were rented out in authorized, rather than unlawfully duplicated, VCD format during the relevant period, those titles should be excluded from the list of 70 works for which U2 Home seeks summary judgment.

The evidence that Defendants offer fails to raise a disputed issue of fact as to whether they ever received authorized VCD versions of any of the 70 TVB Series titles at issue. The shipping invoices are irrelevant. The titles listed on those invoices are entirely distinct from the 70 TVB Series listed in the Amended Schedule. The mere fact that U2 Home distributed certain other videoprograms in VCD format to the Hong Wei store prior to

the execution of the 2003 Sublicensing Agreement has no bearing on whether Defendants rented out unlawfully copied VCD versions of the 70 TVB Series works listed on the Amended Schedule from December 31, 2003 to December 8, 2005. Similarly, Ng's letter to HWV Corp. and Ni's declaration – both of which simply establish that U2 Home supplied Defendants with VCDs of certain titles prior to 2003 – raise no genuine issue of fact as to whether Defendants were ever provided with authorized VCD versions of the 70 TVB Series works. While it is true that Ng's letter to HWV Corp. tends to show that "TVB programs" were at some point given to Hong Wei in authorized VCD format, Defendants have not asserted, and have produced no evidence to show, that the "TVB programs" identified in Ng's letter are the same as the TVB Series works that are covered by the Sublicensing Agreement and that are the subject of the present action. The vague reference to "TVB programs" in Ng's letter is such slight evidence that U2 Home provided Defendants with authorized VCD versions of the 70 TVB series titles as to be insufficient to defeat Plaintiff's motion for summary judgment. See <u>Gallo</u>, 22 F.3d at 1223.

In any event, as U2 Home rightly observes, the Court's findings in the Contempt Order now preclude Defendants from claiming that they ever received authorized VCD versions of the TVB Series programs. Under the doctrine of collateral estoppel, or issue preclusion, a party is barred from relitigating "a specific

legal or factual issue in a second proceeding where '(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.'" Grieve v. Tamerin, 269 F.3d 149, 153 (2d Cir. N.Y. 2001) (quoting United States v. Hussein, 178 F.3d 125, 129 (2d Cir. 1999)). "A prior contempt proceeding . . . has preclusive effect barring relitigation of the same issues." Mason v. Ward, No. No. 88 Civ. 4704, 1991 U.S. Dist. LEXIS 9965 (S.D.N.Y. July 20, 1991) (citing Marlene Industries Corp. v. NLRB, 712 F.2d 1011 (6th Cir. 1983)).

The requirements for collateral estoppel are easily met in this case. First, the issues presented are identical. In the contempt proceeding, the Court was called upon to determine whether Defendants knowingly violated the terms of the Permanent Injunction by distributing unlawfully duplicated copies of the TVB Series works. This required the Court to find, among other things, whether U2 Home had ever issued or otherwise authorized the distribution of VCD versions of the TVB Series works that were covered by the Sublicensing Agreement. On the basis of the testimony at the contempt hearing, the Court concluded that "Plaintiff did not provide Hong Wei any VCD copies of the TVB Programs provided under the TVB Sublicense. As U2's general

21

counsel Alan Huie testified, there are no authorized VCD copies of recent TVB Programs." Contempt Order, at *8. Although the contempt proceeding centered on Defendants' infringement of eight specific titles from the TVB Series, it is undisputed that the "recent TVB Programs," as referenced by the Court, comprise all of the TVB Series titles covered by the 2003 Sublicensing Agreement, and thus encompass the 70 titles that are the subject of the present action. The factual issue decided by the Court in the Contempt Order is thus identical to the present issue, namely whether U2 Home ever supplied Defendants with legitimate VCD versions of the TVB Series works covered by the Sublicensing Agreement.

The other requirements for collateral estoppel are also satisfied. The issue of whether Defendants ever received authorized VCD versions of the TVB Series works was fully litigated and decided, and both parties had ample opportunity to present evidence on this issue during the contempt proceedings. Further, the resolution of the issue was required to support the Court's contempt judgment. The Court's finding that U2 Home never issued any authorized VCD versions of the TVB Series works was a necessary basis for the conclusion that the Defendants' distribution of the VCDs was unauthorized by U2 Home and thus violative of the Permanent Injunction.

In conclusion, Defendants have failed to present any evidence to rebut U2 Home's proof that Defendants were never given

authorized VCD versions of any of the 70 TVB Series titles that are listed in the Amended Schedule.  Further, Defendants' attempt to raise an issue of fact as to whether they received authorized VCDs is foreclosed by the Court's findings in the Contempt Order.

*(ii) The "VCD" Paragraph in the Sublicensing Agreement*

Defendants also argue that the Sublicensing Agreement itself raises a triable issue of fact as to whether they received authorized VCD versions of the TVB Series works.  Defendants cite to paragraph seven of Schedule A of the agreement, which states that Defendants were required to make a minimum purchase of "**0** sets" of VCDs of the TVB Series.  Defendants claim that the agreement's very inclusion of a provision that governs the purchase of VCDs suggests that U2 Home may have distributed authorized VCD versions of the TVB Series programs to the Defendants.

This argument is precluded, again, by the Court's previous findings in the Contempt Order, as discussed above. Further, Defendants have conceded that, after the execution of the Sublicensing Agreement, they never received VCD versions of the TVB Series works.  In light of this admission, Defendants fail to show how the mere inclusion in the Sublicensing Agreement of a paragraph that mentions VCDs raises a dispute about whether Defendants were authorized to receive VCDs of the TVB Series, let alone whether they did in fact receive them.  As Plaintiff correctly points out: "The licensing agreement, the Permanent Injunction, the cease and

desist letter [of April 2004] and this Court's adjudication of contempt all verify that the recent TVB Series are not distributed by U2 Home in VCD format and Hong Wei was not authorized to distribute them." (Pl. Reply Mem. at 4.) That the Sublicensing Agreement stated that Defendants were required to purchase "**0**" VCDs of the TVB Series (as opposed to the 14,800 sets of DVDs that defendants were required to purchase under paragraph three of Schedule A) in fact supports, rather than contradicts, the conclusion that Plaintiff never supplied VCD versions of the TVB Series to the Defendants. Defendants' reliance on paragraph seven of Schedule A of the Sublicensing Agreement is therefore misplaced.

*(iii) Release-and-Waiver Provision of Settlement Agreement*

Defendants also claim that the release-and-waiver provision of the Settlement Agreement bars Plaintiff suing Defendants for their infringement of any TVB Series titles that were the subject of the Prior Action. Defendants cite to paragraph seven of the agreement, which provides as follows:

> 7. The Parties hereby forever release each other . . . from any and all claims, demands, causes of action, damages and liabilities, obligations and costs, arising out of or in connection with or in any way related to this lawsuit or the subject matter thereof, prior to the date of this Agreement.

(Def. Mem. at 13, quoting Decl. of Bing Li in Opp. To Pl. Mot. for Summary Judgment ("Li Decl."), Ex. C.). Defendants have provided a list of dozens of TVB Series titles that are common to both the

Prior Action and the present lawsuit, and urge that the Court grant summary judgment and dismiss "these titles from Plaintiff's List for which it seeks statutory damages." (Def. Mem. at 15.)

Defendants' reading of the provision does not account for the concluding clause, which limits waived claims to those that arose "prior to the date of this Agreement." In other words, under the plain meaning of the provision, U2 Home relinquished its right to bring suit for any act of duplication that occurred prior to November 21, 2003, the date of the Settlement Agreement's execution. The provision simply does not operate to permit unlimited future acts of infringement with respect to those TVB Series titles that were the subject of the Prior Action. As Plaintiff correctly observes, if the release provision barred U2 Home from bringing any copyright claims for any infringement that occurred after the execution of the Settlement Agreement, there would have been no need for the entry of the Permanent Injunction, and many of the terms of the Sublicensing Agreement would have been rendered gratuitous. Defendants' interpretation of the release-and-waiver provision is at odds with both the provision's plain language and common sense.

*(iv) Implied License*

Defendants argue that triable issues of fact exist as to whether they were granted an implied license to distribute the TVB Series programs in VCD format. Defendants claim that, after

execution of the 2003 Sublicensing Agreement, Plaintiff knew that the only way for Defendants meaningfully to perform the agreement was to convert the DVDs into VCD format; otherwise, Defendants claim, if the Hong Wei store had attempted to rent out the TVB Series works only in DVD format, their "customers would have stopped renting from Hong Wei." (Def. Mem. at 11.) Defendants cite to Ni's testimony at the contempt hearing, regarding a conversation Ni had with U2 Home's sales manager, Cindy Ng, shortly after the execution of the Sublicensing Agreement. During this conversation, Ni complained that the DVDs of the TVB Series provided by Plaintiffs under the agreement were not useful because, as Ni said, "[a]ll our customer is DVD – I mean VCD, not from DVD." (Def. Mem. at 11, quoting Contempt Hearing Tr. at 66.) According to Ni, Ng told him to "solve your own problem." (Id.) Ng also testified at the contempt hearing that, during negotiations over the terms of the Sublicensing Agreement, Ni asked if he could receive VCD versions of the TVB Series programs but was told that this was not possible because U2 Home "only issues DVDs" and thus "could only provide him with DVDs." (Id., quoting Contempt Hearing Tr. at 181.) Defendants argue that from the above-mentioned testimony "it can be inferred that the business demand for Ni's rental store was for VCD, not DVD. It then follows that the only way for Hong Wei to meaningfully perform the 2003 License Agreement was to convert its rental population from viewing in VCD to DVD format." (Def. Mem. at

11.)

Defendants have offered no evidence to show that an implied license existed. "[A]n implied license will be found only in narrow circumstances where one party created a work at the others request and handed it over, intending that the other copy and distribute it." Ulloa v. Universal Music & Video Distribution Corp., 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004). Defendants bear the burden of proving the existence of an implied license. Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995). "In order to establish an implied license, as for any implied contract, [the Defendants] must prove that there was a meeting of the minds." Ulloa, 303 F. Supp. 2d at 416.

Defendants suggest that, despite the clear language of both the Permanent Injunction and the Sublicensing Agreement that flatly prohibited copying the TVB Series programs, they were given the implicit approval to copy the DVDs onto VCDs because (i) Plaintiff had provided Defendants with VCDs from 1998 to 2002 pursuant to an oral agreement; (ii) Plaintiff was aware that the Hong Wei store primarily catered to customers who rented VCDs and that the Sublicensing Agreement would not be of much use to Defendants if it only permitted them to rent out DVDs; and (iii) when U2 Home's sales manager was told by Jixong Ni that Hong Wei needed VCDs rather than DVDs, she responded that it was the Defendants' problem to solve, thus impliedly authorizing Defendants to fix the problem by copying the DVDs onto VCDs. There are

several problems with these contentions.  First, even crediting Ni's contention about the existence of an oral agreement that arose between the parties in 1998, the terms of the 2003 Sublicensing Agreement are crystalline.  Once that agreement was concluded, Defendants were expressly prohibited from duplicating or distributing duplicated copies of the TVB Series DVDs.  The conversation between Ni and Ng, on which Defendants rely, establishes only that Plaintiff refused to provide the Hong Wei store with VCD copies of the TVB Series.  U2 Home's awareness that Hong Wei was primarily in the business of renting VCDs and Cindy Ng's admonition that this was Defendants' problem to solve simply do not amount to a "meeting of the minds" that effectively modified the concrete, written terms of the Sublicensing Agreement.

In sum, Plaintiff has established beyond any dispute that it holds a valid copyright in each of the 70 TVB Series titles listed in the Amended Schedule.  It is also uncontested that Defendants rented out VCD versions of those 70 TVB Series titles to Hong Wei's retail customers between December 31, 2003 and December 8, 2005.  Finally, Plaintiff has established, and Defendants have failed to rebut, that the VCDs of the 70 TVB Series titles rented out by the Hong Wei store during the Relevant Period were unauthorized duplications of Plaintiff's DVDs and that Defendants' distribution of the VCDs thus violated Plaintiff's copyright.

*(B) DAMAGES*

Under the Copyright Act, "an infringer of copyright is liable for either (1) the copyright owner's actual damages and any additional profits of the infringer . . ., (2) statutory damages as provided by subsection (c)." 17 U.S.C. § 504(a). Subsection (c) of the statute provides, in relevant part, that the copyright owner may elect to recover "statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just." Id. § 504(c)(1). In addition, a court may award up to $150,000 where the court finds that the infringement was willful. Id. § 504(c)(2). A court has broad discretion in awarding a specific amount of statutory damages under 17 U.S.C. § 504(c). See Fitzgerald Publ'g Co. v. Baylor Publ'g, 807 F.2d, 1110, 1116 (2d Cir. 1986). Factors to be considered in the determination of an appropriate award include: "the expenses saved and profits reaped by the defendant; the value of the copyright; the deterrent effect of the award on other potential infringers; the innocence or willfulness of the infringer's conduct; whether the defendant has cooperated in providing records from which to assess the value of the infringing materials produced; and the potential of the award for discouraging the defendant." Masterfile Corp. v. J.V. Trading (Glendale) Ltd., No. 06 Civ. 6204, 2007 U.S. Dist. LEXIS 52044, at *5-6 (S.D.N.Y.

July 18, 2007) (citing <u>Fitzgerald Publ'q</u>, 807 F.2d at 1117)). "Statutory damages are calculated based on the number of copyrighted works infringed, and not on the number of times the defendant engaged in infringing conduct." <u>U2 Home Entm't, Inc. v. China Video, Inc.</u>, No. 04 Civ. 6139, 2006 U.S. Dist. LEXIS 2788, at *7-8 (S.D.N.Y. Jan. 23, 2006), report and rec. (citing <u>Twin Peaks Prods. v. Publ'ns Int'l, Ltd.</u>, 996 F.2d 1366, 1381 (2d Cir. 1993)).

U2 Home elects to recover statutory damages and seeks an award of $750 for each of the 1,236 episodes that were contained on the 70 separate TVB Series titles that Defendants rented out in VCD format during the Relevant Period, for a total award of $927,000. Defendants protest that statutory damages should be awarded on a "per VCD" rather than a "per episode" basis.

Section 504(c) of the Copyright Act does not define what constitutes a "work" for the purpose of computing statutory damages. In <u>Twin Peaks</u>, 996 F.2d at 1381, the Second Circuit held that the screenplays and videos of separately copyrighted television episodes from a single television series may be considered separate "works" within the meaning of Section 504(c). It remains an open question in this circuit, however, "whether individual television episodes, which are not separately copyrighted but, rather, are part of a copyrighted television series, may be considered individual works for the purpose of calculating statutory damages." <u>China Video</u>, 2006 U.S. Dist. LEXIS

30

2788, at *9.

The First Circuit, however, has addressed this issue. In Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106 (1st Cir. 1993), as here, the court was called upon to decide whether several episodes of a Hong Kong-produced TVB Series program, which had a single copyright registration, constituted one or several "works" for the purpose of calculating statutory damages. The Gamma court acknowledged that the case before it was distinguishable from Twin Peaks, because, among other things, the individual episodes of the TVB Series program were not separately copyrighted. However, the First Circuit found that this distinction was of little moment, explaining as follows:

> Under regulations promulgated by the Copyright Office, the copyrights in multiple works may be registered on a single form, and thus considered one work for the purposes of registration, see 37 C.F.R. § 202.3(b)(3)(A), while still qualifying as separate "works" for purposes of awarding statutory damages. We are unable to find any language in either the statute or the corresponding regulations that precludes a copyright owner from registering the copyrights in multiple works on a single registration form while still collecting an award of statutory damages for the infringement of each work's copyright.

Id. at 1117. Thus, the Gamma court reasoned, the mere fact that multiple television episodes were not separately registered did not bar the copyright owner from claiming statutory damages for each of the infringed episodes. The First Circuit also found it irrelevant that the television series at issue was sold only in complete sets: "A distributor's decision to sell or rent complete sets of a series

31

to video stores in no way indicates that each episode in the series is unable to stand alone." Id.

To decide whether each separate TVB episode constituted an independent "work" for purposes of computing damages, the First Circuit applied the test, announced in Walt Disney Co. v. Powell, 897 F.2d 565 (D.C. Cir. 1990), of whether "distinct works . . . can 'live their own copyright life'." Id. at 569 (quoting Robert Stigwood Group, Ltd. v. O'Reilly, 530 F.2d 1096, 1105 (2d Cir. 1976)). The Gamma court explained that "[t]he test set forth in Walt Disney is a functional one, with the focus on whether each expression (or in our case, television episode) has an independent economic value and is, in itself, viable." Gamma, 11 F.3d at 1116-17. The court concluded that each of the infringed TVB Series episodes had independent economic value, because each episode was produced and aired independently from the other episodes, and "was prepared as part of a weekly (or perhaps daily) series." Id. at 1118. The First Circuit also found it irrelevant that the TVB Series program at issue was sold to consumers in a boxed set containing all of the episodes in the series, explaining that "(1) viewers who rent the tapes from their local video stores may rent as few or as many tapes as they want, may view one, two, or twenty episodes in a single sitting, and may never watch or rent all of the episodes; and (2) each episode in the [TVB] series was separately produced." Id. at 1117. Accordingly, the First Circuit

concluded that each episode was to be considered a separate "work" for the purpose of calculating statutory damages.

Courts in the Southern District, in adjudicating copyright claims arising from other defendants' infringement of U2 Home's television programs, have relied on Gamma's reasoning in holding that each infringed episode of a television series, though not separately copyrighted, is a separate "work" for purposes of computing statutory damages. See China Video, 2006 U.S. Dist. LEXIS 2788, at *10 (finding Gamma's reasoning persuasive, in light of the fact that U2 Home's television programs "which are akin to American soap operas, implicate hundreds of unique episodes, which appear in a series format"); U2 Home Entm't, Inc. v. Fu Shun Wang, 482 F. Supp. 2d 314, 319 n.5 (E.D.N.Y. 2007), report and rec. adopted by 482 F. Supp. 2d 314 (E.D.N.Y. 2007) ("Plaintiff is entitled to recover statutory damages for each episode of its television programs that was unlawfully distributed, even though the copyright registrations may only apply to the television series as a whole."); U2 Home Entm't, Inc. v. Doe, No. 04 Civ. 4402, 2005 U.S. Dist. LEXIS 27142 (E.D.N.Y. Sept. 13, 2005), report and rec. (recommending award of per episode damages for infringement of U2 Home's TVB Series); see also Antenna TV v. Aegean Video, No. 95 Civ. 2328, 1996 U.S. Dist. LEXIS 7688 (E.D.N.Y. Mar. 20, 1996), report and rec. adopted by 1996 U.S. Dist. LEXIS 7643 (E.D.N.Y. Apr. 23, 1996).

Defendants do not dispute that the TVB Series episodes at issue in this case "are akin to American soap operas, implicate hundreds of unique episodes" and "appear in a series format." China Video, 2006 U.S. Dist. LEXIS 2788 at *10. Instead, Defendants assert that the Plaintiff has failed to satisfy the "independent economic value" test applied by the Gamma court. Defendants argue that the fact that each VCD at issue in this case tended to contain as many as twenty or more episodes militates against a finding of independent economic value. In addition, Defendants note that in Gamma, the First Circuit observed that each television episode was separately produced; here, by contrast, Defendants maintain that U2 Home has not come forward with any evidence to show that the TVB Series episodes were separately produced. Defendants also cite to UMG Recordings, Inc. v. MP3.Com, Inc., 109 F. Supp. 2d 223 (S.D.N.Y. 2000), in which Judge Rakoff rejected the "independent economic value" test adapted by the First Circuit in Gamma and held that statutory damages were to be calculated on the basis of each musical CD that was infringed, rather than on the basis of each song contained on each CD.

Defendants' arguments are unavailing. First, as the First Circuit found in Gamma, the mere fact that the videoprgrams at issue were distributed in sets of episodes, and that most of the VCDs on the Amended Schedule contained twenty or more episodes, does not deprive each episodes of independent economic value.

Second, there is no dispute that the episodes of the TVB Series programs were originally produced and broadcast in Asia and subsequently recorded for distribution in the United States. Defendants have offered no evidence to show that the episodes of the TVB Series programs are distinguishable from episodes of the television series at issue in Twin Peaks, Gamma, or the other cases cited. Further, Defendants' reliance on UMG Recordings is misplaced. That case involved separate musical compositions embodied on a compact disc ("CD"), not separate television programs. In addition, it was undisputed that the separate musical compositions in UMG Recordings comprised a "compilation" within the meaning of section 504(c) of the Copyright Act. See § 504(c)(1) ( "For the purposes of this subsection, all parts of a compilation or derivative work constitute one work."). The fact that the CD at issue in UMG Recordings was identified as a compilation essentially foreclosed the plaintiff's argument that the constituent songs were each separate works for purposes of computing statutory damages. Here, by contrast, there is no contention that each of the TVB Series titles is a "compilation." Thus, the court's rejection of the "independent economic value" test in UMG Recordings occurred in a context entirely distinct from the present one.

Accordingly, the Court finds that each infringed episode of the 70 TVB Series programs is a "work" within the meaning of the Copyright Act and that statutory damages therefore will be awarded

on a "per episode" rather than a "per VCD" basis.

Turning next to the appropriate amount of the award, I find that the minimum statutory award of $750 per infringed episode is entirely appropriate, and easily justified by strong evidence of Defendants' willfulness and the obvious need to deter them from committing future acts of infringement. Defendants copied U2 Home's copyrighted programs onto their own VCDs in breach of the Sublicensing Agreement and in blatant defiance of the Court-ordered Permanent Injunction. Under such circumstances, there is no question that a grant of the minimum award provided by statute is warranted.

U2 Home is not, however, entitled to statutory damages for infringement of all 70 of the TVB Series titles it has identified on its amended schedule. Defendants have submitted a schedule that lists eighteen TVB Series titles that were published and first rented out in VCD format, and thus infringed upon, before the titles were registered with the Copyright Office (the "Schedule D" titles). (<u>See</u> Li Decl., Ex T; also listed as "Schedule D: Titles of TVB Programs Rented by Hong Wei prior to the Registration but after Publication Dates," in Def. Mem. at 22.) Statutory damages and attorneys' fees and costs are not authorized under the Copyright Act where "any infringement of copyright in an unpublished work commenced before the effective date of its

registration." 17 U.S.C. § 412.[7] "Where a series of acts constituting continuing infringement is alleged, the infringement 'commences' for purposes of determining eligibility for statutory damages and attorney's fees and costs 'when the first act of infringement in a series of on-going discrete infringements occurs." Shady Records, Inc. v. Source Enters., No. 03 Civ. 9944, 2004 U.S. Dist. LEXIS 26143, at *67-68 (S.D.N.Y. Dec. 30, 2004) (quoting EZ-Tixz, Inc. v. Hit-Tix, Inc., 919 F. Supp. 728, 736 (S.D.N.Y. 1996)).

U2 Home does not contest the accuracy of the dates of registration, publication, and first infringement that are attributed to each of the titles listed on Schedule D. It is therefore undisputed that each of the TVB Series titles identified on Schedule D was infringed upon prior to the date of its registration. However, while U2 Home concedes that the initial infringements of the Schedule D titles occurred prior to the dates of registration, U2 Home argues that under the Second Circuit's recent holding in Troll Company v. Uneeda Doll Co., 483 F.3d 150 (2d Cir. 2007), "a post-registration act of infringement will not be deemed to have commenced before registration if the infringing

_____

[7]Section 412 also provides a copyright owner a three month, post-publication grace period during which the owner may register a work without loss of remedies. It is undisputed that the Schedule D titles were not registered within three months of their publication, and therefore the grace period does not apply.

activity ceased for an appreciable period of time." Id. at 158-59. Plaintiff contends that, for most of the eighteen works listed on Schedule D, a substantial period of time lapsed between the initial incident of pre-registration infringement and the post-registration resumption of infringement. Thus, Plaintiff argues, because an "appreciable period of time" lapsed between the initial infringement and the resumption of infringing activity, Section 412 does not bar Plaintiff from obtaining statutory damages for the Schedule D titles.

The Second Circuit's holding in Troll does not enable U2 Home to avoid the bright-line stricture of Section 412. Troll is inapposite. In Troll, the plaintiff sought to enforce its recently restored copyright in a line of dolls. The defendant had begun to copy the plaintiff's dolls at a time when the copyright was in the public domain. Defendant subsequently ceased copying the dolls for nearly a decade, during which time the plaintiff restored its copyright. Defendant then resumed its copying. After plaintiff sued for copyright infringement, the defendant claimed it had "reliance party status," within the meaning of Section 104A of the Copyright Act, and thus was entitled to a grace period during which it could lawfully sell off its inventory of infringing dolls.[8] The

_____

[8]"A reliance party. . . is one who, with respect to a particular work whose copyright has been lost, makes 'copies' of that work while it is in the public domain, and thereafter, notwithstanding that the original copyright ownership has been restored, is given one year free of an infringement claim to sell

*Troll* court stated that, under Section 104A, reliance party status could be conferred "only on persons whose infringement is ongoing and without more than trivial interruption." *Troll*, 483 F.3d at 159.  The Second Circuit reasoned that the "reliance party" provision of Section 104A sought to protect parties that "invested time and resources into ongoing exploitation of a work in reliance on the work's public domain status," and that "would incur substantial harm from the sudden inability to engage in that business." Id.  The court reasoned that, by contrast, a party that "has voluntarily ceased exploitation for a non-trivial period of time, here, nine or ten years . . . has a less substantial interest in being able to resume that exploitation after restoration." Id.  The *Troll* court concluded that, because such a long period of time had lapsed between infringements, the defendant was not entitled to the grace period typically conferred on a party that has continued to copy a work in reliance on the work's apparent public domain status.

The legal question in *Troll* is different from the question presented here.  This case does not involve the restoration of a lost copyright, or a defendant's claim that it is a reliance party within the meaning of Section 104A.  The Second Circuit's holding in *Troll*, that the passage of an "appreciable

off any existing inventory of these copies." Troll Co. A/S v. Uneeda Doll Co., 400 F. Supp. 2d 601, 603 (S.D.N.Y. 2005) (citing 17 U.S.C. § 104A(d), (h)(4)).

period of time" between acts of infringement may preclude the infringement from being deemed continuing for purposes of determining whether the infringer is a reliance party, simply has no bearing on the application of Section 412 in this case. Moreover, <u>Troll</u> is distinguishable on its facts. The "appreciable period of time" between infringements in that case was nearly a decade. Here, by contrast, the periods between pre- and post-registration acts of infringement for the eighteen titles listed on Schedule D are far shorter, ranging from eight days to slightly more than two years.

Section 412 imposes a bright-line rule, barring the recovery of statutory damages "for infringement occurring after registration if that infringement is part of an ongoing series of infringing acts and the first act occurred before registration." <u>Id.</u> at 158. "[U]nder 17 U.S.C. § 412, as long as infringement commenced before the date of registration, statutory damages and attorney's fees are barred even if infringement continued after the date of registration." <u>Silberman v. Innovation Luggage, Inc.</u>, No. 01 Civ. 7109, 2003 U.S. Dist. LEXIS 5420, at *29 (S.D.N.Y. Mar. 31, 2003). The test urged by Plaintiff –- that of determining whether sufficient time has passed between pre- and post-registration infringement –- would "requir[e] courts to determine when a series has stopped sufficiently such that the restart constitutes a new series of infringements" and is inferior to the bright-line rule,

40

"which is easily applied to preclude recovery of statutory damages and attorney's fees and costs where any infringement occurs before the effective date of the work's copyright registration." Shady, 2004 U.S. Dist. LEXIS 26143, at *71.

Plaintiff's invocation of public policy is also unavailing. Plaintiff argues that, to permit Defendants to commit post-registration infringements of the Schedule D titles with impunity would allow them to benefit from their unlawful conduct, and therefore would defeat the purposes of the Copyright Act. As the court observed in Shady, where plaintiff was barred under Section 412 from obtaining statutory damages even though the post-registration infringement occurred in violation of a temporary restraining order, "[t]o the extent that the infringer has stopped, as here, because of a court order, subsequent acts of infringement are particularly repugnant. But for that, a contempt remedy is available, and, indeed, Shady has successfully utilized that remedy here." Id. at *72. Here, too, the remedy of a contempt sanction has been applied and may be imposed again in the event that Defendants continue their infringing conduct.

Accordingly, Plaintiff is precluded from obtaining statutory damages for the infringement of the eighteen TVB Series titles that are listed on Schedule D. The Court calculates that the eighteen titles on Schedule D encompass 342 episodes. Thus, Plaintiff is limited to an award of statutory damages for

Defendants' infringement of 52 (rather than 70) titles, encompassing 894 (rather than 1,236) episodes, with total damages amounting to $670,500 (rather than $927,000), exclusive of costs and fees.

*Attorney's Fees and Costs*

Section 505 of the Copyright Act provides that:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505. In <u>Fogerty v. Fantasy</u>, 510 U.S. 517 (1994), the Supreme Court held that fees and costs should be awarded to prevailing parties, not as a matter of course, but rather as a matter of the court's discretion and that prevailing plaintiffs and defendants should be treated equally. <u>Id.</u> at 534. The Court suggested several nonexclusive factors that courts may consider in deciding to award fees and costs, "so long as such factors are faithful to the purpose of the Copyright Act" and applied evenhandedly. <u>Id.</u> at 534 n.19. The factors include "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case), and the need in particular circumstances to advance considerations of compensation and deterrence." <u>Id.</u> "Advancement of considerations of compensation and deterrence means that the Court should look at whether an award

of attorneys' fees will not only compensate parties for raising 'objectively reasonable claims and defenses,' but also 'deter infringement.' Crown Awards, Inc. v. Disc. Trophy & Co., No. 07 Civ. 1400, 2008 U.S. Dist. LEXIS 52705, at *7-8 (S.D.N.Y. July 9, 2008) (quoting Matthew Bender & Co. v. West Publ'g. Co., 240 F.3d 116, 122 (2d Cir. 2001) ).

An award of attorneys' fees and costs to U2 Home is appropriate in this case, in light of the Defendants' willful conduct. Even after the settlement of the Prior Action, the execution of the Sublicensing Agreement, the entry of the Court-ordered Permanent Injunction, and their receipt of U2 Home's cease-and-desist letter, Defendants continued to duplicate Plaintiff's DVDs onto their VCDS and unlawfully distribute the copies to their retail customers. A main purpose of the Copyright Act is to deter willful infringement of copyrighted works. See Kepner-Tregoe, Inc. v. Vroom, 186 F.3d 283, 289 (2d Cir. 1999) (affirming award of attorney's fees under the Copyright Act as "justified based on the court's finding of willfulness" and "in line with the statutory goal of deterrence"); Yash Raj Films (USA) Inc. v. Movie Time Video USA, Inc., No. 04 Civ. 5107, 2007 U.S. Dist. LEXIS 68357, at *12 (E.D.N.Y. July 26, 2007), report and rec. (finding that "an award of attorney's fees is justified where the infringement was willful"); Getaped.com, Inc. v. Cangemi, 188 F. Supp. 2d 398, 406 (S.D.N.Y. 2002) ("An award of attorney's fees is justified, inter

alia, where the infringement was willful, as here."). The need to award fees and costs in the service of deterrence is particularly compelling in this case, where the Defendants continued to violate Defendants' copyrights, even in the face of a Court-ordered injunction.

Accordingly, the Court finds that Defendants must pay U2 Home's reasonable attorneys' fees and costs expended in connection with this litigation.

*(C) COUNTERCLAIM*

Plaintiff seeks dismissal of Defendants' counterclaim, in which Defendants assert that U2 Home is culpable of deceptive business practices, under Section 349 of New York's General Business Law (the "GBL"), for the knowing misuse of the "Tai Seng" name. Specifically, Defendants claim that Plaintiffs have operated under the name "Tai Seng Entertainment, a division of U2 Home Entertainment, Inc.," since 1998, without revealing that "Tai Seng" was merely one of several names under which U2 Home conducted its business and without registering the "Tai Seng" name as a "doing business name" as required under New York law. (See Def. Local Rule 56.1(b) Statement of Controverted Material Facts ¶¶ 13-17.) Defendants have also claimed that "there are many others similarly situated as Mr. Ni who did not know" the true status of Tai Seng as a mere "doing business name" of U2 Home. (Id. ¶ 15.)

Section 349 of the GBL prohibits "[d]eceptive acts or

practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state," and provides an express private right of action to "any person who has been injured by reason of any violation" of the statute. N.Y. GBL § 349(a), (h). To establish a claim under Section 349, a claimant "must show (i) that the act or practice was misleading in a material respect, and (ii) that the plaintiff was injured." Ortho Pharmaceutical Corp. v. Cosprophar, Inc., 32 F.3d 690, 697 (2d Cir. 1994) (quoting Coors Brewing Co. v. Anheuser-Busch Cos., 802 F. Supp. 965, 975 (S.D.N.Y. 1992)) (internal quotation marks omitted). Section 349 is a consumer protection statute that "generally prohibits only those deceptive practices affecting the public at large." Netzer v. Continuity Graphic Assocs., 963 F. Supp. 1308, 1323 (S.D.N.Y. 1997). "Private transactions not of a recurring nature or without ramifications for the public at large do not fall within the purview of section 349." Id. As Judge Weinfeld explained in Genesco Entertainment v. Koch, 593 F. Supp. 743 (S.D.N.Y. 1984):

> The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising. The consumer oriented nature of the statute is evidenced by the remedies it provides. . . . The New York cases where plaintiffs have recovered under section 349(h) further reflect its consumer orientation since they uniformly involve transactions where the amount in controversy is small. That the deceptive practices this statute seeks to combat involve recurring transactions of a consumer type is further supported by the origin of the statute. Section 349(h) is substantially modeled on the Federal Trade Commission Act [15 U.S.C. § 45].

Id. at 751-52. Thus, "to plead and prove a claim for relief under this statute, the plaintiff 'must, at the threshold, charge conduct that is consumer oriented.'" Occidental Chem. Corp. v. OHM Remediation Servs., 173 F.R.D. 74, 76-77 (W.D.N.Y. 1997) (quoting New York University v. Continental Insurance Co., 87 N.Y.2d 308, 320 (1995)). "Private contract disputes unique to the parties . . . would not fall within the ambit of the statute." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d 20, 25 (1995). Defendants, therefore, "must plead and prove injury to the public generally, not just to [themselves]." Occidental Chem. Corp., 173 F.R.D. at 77.

Defendants' counterclaim arises from certain representations allegedly made by Plaintiff "[i]n the course of the parties' negotiation of the terms of the [Sublicensing] Agreement." (Li Decl., Ex G. ("Countercl.") ¶ 16). U2 Home's alleged misuse of the "Tai Seng" name occurred in the context of negotiations and transactions that took place between merchants, specifically between Jixong Ni, as the Hong Wei store's owner and operator, and U2 Home, as the store's wholesale supplier of videoprograms that Hong Wei in turn sold or leased to its retail customers. Defendants have produced no evidence to show that Plaintiff's unregistered and allegedly misleading use of the "Tai Seng" name had any effect upon the public at large. Although Defendants have alleged that U2 Home's supply of videoprograms to "rental video

stores are consumer oriented [sic] act and practice," (Countercl. ¶ 61), Defendants have offered no evidence whatsoever to show that retail customers of the Hong Wei store, or of any other video retailer, were exposed to, let alone, suffered harm as a result of U2 Home's use of the "Tai Seng" name in association with its films and television programs. The sole "proof" of public harm offered by Defendants is contained in the following statement by Ni in his declaration: "I have also inquired [sic] others about their understanding of Tai Seng and was surprised to know that they all shared my previous understanding." (Ni Decl. ¶ 34.) Ni does not identify whether these "others" are consumers or fellow merchants, nor does he describe the context in which they were exposed to, and allegedly deceived by, U2 Home's purportedly misleading use of the "Tai Seng" name. Defendants have not come close to establishing that the conduct that forms the basis of their counterclaim was consumer oriented. Therefore, because "[t]he only parties truly affected by the alleged misrepresentations in this case are the plaintiff and the defendants," Defendants' Section 349 counterclaim must be dismissed. Genesco, 593 F. Supp. at 752.

## CONCLUSION

For the reasons set forth above, U2 Home's motion for summary judgment in favor of its claim for copyright infringement is GRANTED. In addition, U2 home's motion for summary judgment dismissing Defendants' counterclaim is GRANTED, and the

47

counterclaim is DISMISSED with prejudice. U2 Home's remaining claim for trademark infringement is also DISMISSED.

U2 Home is hereby awarded statutory damages in the amount of $750 for each of the 894 episodes that was infringed and for which U2 Home is permitted under the Copyright Act to obtain recovery. U2 Home is therefore awarded a total of $670,500 in statutory damages, exclusive of costs and reasonable attorneys' fees. U2 Home is directed to submit a statement of costs and reasonable attorneys' fees, together with applicable time records and other appropriate supporting documentation, within twenty-eight (28) days of the entry of this Order. U2 Home is also directed to submit to the Court within the same time period any proposed modifications to the Permanent Injunction. Defendants' objections, if any, to U2 Home's submissions are due no later than twenty-eight (28) days thereafter.

SO ORDERED.

Dated:       New York, New York
             August 2 1 , 2008


                              _____
                              JOHN F. KEENAN
                              United States District Judge